THE THOMAS J. CLEAVER. THE MARY C. McNALLY. LYNCH et al. v. McNALLY et al.

No. 79 of 1929.

District Court, E. D. Pennsylvania.
March 25, 1930.

Samuel B. Fortenbaugh, Jr., and Acker, Manning & Brown, all of Philadelphia, Pa., for libelants.

Leslie C. Krusen and Biddle, Paul, Dawson & Yocum, all of Philadelphia, Pa., for respondents.

THOMPSON, District Judge.

A libel was filed by William J. Lynch, as master and bailee of the barge Thomas J. Cleaver and as bailee of the cargo laden thereon, and Dempsey Sons Barge Company, a corporation, owner of the Cleaver, against the steam tug Mary C. McNally in rem, and James McNally, as her owner in personam, to recover damages incurred by the Cleaver and her cargo while being towed by the McNally. The damages claimed are alleged to have been sustained through negligence in the operation of the McNally while towing the Cleaver and the barge Rita Dempsey through the draw of the Baltimore & Chesapeake Railroad bridge over the Nanticoke river, at Vienna, Md., causing the Cleaver to collide with the caisson of the bridge and to sink, after having been towed a short distance above the bridge.

On May 7, 1929, the libelant, Dempsey Sons Barge Company, and the respondent, James McNally, as owner of the tug McNally, entered into a towage contract to tow the Cleaver and the Dempsey, each having been loaded with slag at Sparrows Point, Md., for delivery at Laurel, Del. The Cleaver and the Dempsey were wooden barges, the former 170 feet in length and 23 feet 8 inches in breadth, and the latter 175 feet in length and 23 feet 10 inches in breadth. The steam tug McNally was 88 feet 5 inches in length and 21 feet in breadth.

The tug, after leaving Chesapeake Bay, proceeded up the Nanticoke river with the barges in tow lashed one on either side of the tug. On the afternoon of May 9, upon nearing the bridge, the tug with her tow stopped in the river, the barges were dropped astern of the tug on hawsers from 12 to 15 fathoms in length, and lashed together side by side, the Cleaver on the port side and the Dempsey on the starboard side. The tug then proceeded up the river toward the starboard draw of the bridge. On the right-hand side of the draw, going upstream, the abutment is protected with spring piling, and on the left-hand side there is a steel caisson at about the middle of the abutment upon which the draw operates. The width of the draw between the two abutments is about 58 feet.

The McNally proceeded through the center of the draw, and was practically through the draw when the Cleaver and Dempsey entered it. As the barges entered the draw, the Dempsey sheered to starboard, her steersman put the wheel hard to starboard to avoid striking the abutment, her starboard bow, however, struck the piling a glancing blow, which caused the Dempsey to swing to port pushing the Cleaver over and the Cleaver's port bow struck the steel caisson with considerable force. The master of the McNally towed the barges about half a mile above the draw and anchored them before returning to the bridge to ascertain what damage had been done there. The master of the Cleaver was asked by the master of the tug whether the barge was damaged and, after making a perfunctory examination, he replied that it was not, except that two sheathing boards, which had been nailed to her side, were knocked off. He then accepted the invitation of the master of the tug to accompany him to the bridge and left the Cleaver at anchor with no one on board but a negro deck hand. The masters of the tug and the barge remained at the drawbridge for a time estimated to be from an hour to an hour and a half, when it was noticed that the Cleaver was settling in the water. The tug then returned to the Cleaver, which was rapidly filling, and beached her upon the flats, but was unable to prevent her from sinking.

The charges of fault against the McNally, which are urged by the proctors for the libelants, are that the master of the tug caused the two barges to be towed double, their double breadth being 47 feet 6 inches, through a draw only 58 feet in width, and too narrow for the tow to go through safely, when they should have been navigated through the draw in tandem tow, whereby each would have had ample clearance space for passage. It is urged that the barges, being in charge of the master of the tug and having no voice in the decision as to how they were to be towed through the draw, were under no responsibility in that matter and that the sinking of the Cleaver was due to the fault of the master of the tug in failing to stand by the Cleaver until her injuries were ascertained so that she might be kept afloat.

The facts, as deduced from the evidence bearing upon the collision of the Cleaver with the caisson of the drawbridge, I find to be as follows: The master of the tug, although an experienced man in towage, had not navigated the Nanticoke river for many years and was not familiar with the tide and current conditions at and about the bridge. Before causing the two barges to be lashed together, he inquired of some one upon a passing boat, down the river, whether the draw was of sufficient width to take the two barges through. His question indicates a doubt in his own mind as to whether it could be safely accomplished. I find from the testimony of the drawbridge. tender that the practice followed was not the customary one. He testified that, in his experience, he had never seen two barges of the size of the Dempsey and Cleaver towed through the draw abreast. The master of the tug, therefore, had not sufficient knowledge of the conditions at the draw to form an independent judgment as to whether the attempted manner of towage was safe.

Neither had he given any instructions to the master of the barges as to how to steer on approaching and entering the draw. Testimony was introduced on the part of the respondents of tests, made at some previous time, of the currents in the river by an engineer of the railroad company, which tended to show that the current caused by the tide carried floating objects to the left upstream side of the river immediately below the bridge. There is nothing in this testimony, however, to show how the current directly below the draw, as a vessel entered, would be affected by these currents. I do not find any fault against the masters of the barges in their method of steering. It appears that, until the bows of the barges were close to the draw, they were directly following the tug. The testimony of the master of the Dempsey is that his bow suddenly sheered to starboard, causing it to strike the piling, and that he immediately threw his wheel to starboard to straighten the Dempsey out. The force of hitting the spring piling, however, threw her so far to port that the bump against the Cleaver threw her bow against the caisson.

Notwithstanding the testimony of the interested witnesses on the part of the tug that the collision was caused by faulty steering of the barges, I am forced to the conclusion that the entries in the McNally's log show the true cause of the sheer. If the master of the McNally had considered that faulty steering was the cause, he undoubtedly would have so stated in his log at the time the occurrence was fresh in his mind. The entry, made shortly after the collision, is to the effect that the tide swung the barges to starboard and the Dempsey against the piling of the abutment. Whatever injury was the direct consequence of the Cleaver striking the caisson must, therefore, be based upon two established facts, namely: That the master of the McNally did not exercise due care in attempting to crowd the two barges abreast through the very narrow passage of the draw when the entire width in the draw was only 58 feet, leaving a clearance margin for the two barges of about 10 feet; and that he was not sufficiently experienced in knowledge of the tide and current in their effects upon navigation at and immediately below the draw to know whether the passage he attempted could be accomplished with safety to his tow. The sinking of the Cleaver, however, must be attributed to the want of due care upon the part of her master. As he died between the time of the collision and the time of taking testimony in the case, his testimony was never taken, but it clearly appears that his examination of the Cleaver was merely casual and that he satisfied himself without sufficiently careful examination that her injuries were of little consequence. His duty, after his barge had received an injury, was to remain with her rather than to yield to the invitation of the master of the tug to abandon her in charge of a deck hand, without giving him any instructions, so as to visit the bridge in company with the master of the tug for an opportunity to talk to the drawbridge tender. A tugboat owner is not an insurer, and his contract of towage is no defense against negligence in inspecting a towed vessel by the

man in charge of the tow. Eclipse Lighterage Company v. Cornell Steamboat Company (C. C. A.) 242 F. 927.

■ The intervening negligence on the part of those in charge of a vessel being towed which resulted in damages from sinking cannot be charged against the towing tug on the ground of merger of the original fault with consequences caused by an intervening fault. The Mars (D. C.) 9 F.(2d) 183. Whatever injuries, therefore, were caused to the hull of the Cleaver by the impact of the barge with the bridge, must be borne by the respondent. But the damage claimed for injuries to the barge and her cargo through the sinking must be borne by the libelants.

A decree may therefore be entered in favor of the libelants for such damages as have been sustained in accordance with the above ruling with reference to a commissioner in accordance with the usual practice.